Filed 12/9/24  P. v. Rivas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CIRILO GUDINO RIVAS,<br><br>    Defendant and Appellant. | D083708<br><br><br>(Super. Ct. No. FSB19003481) |


APPEAL from a judgment of the Superior Court of San Bernardino, Steve C. Malone, Judge.  Affirmed.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson and Tyler L. Krentz, Deputy Attorneys General for Plaintiff and Respondent.

# I

## INTRODUCTION

Cirilo Gudino Rivas appeals a judgment of conviction after a jury found him guilty of committing numerous sex crimes against his partner's underage granddaughter and an unrelated minor who lived in the neighborhood. He contends the judgment must be reversed because the trial court inadvertently and erroneously provided the jury with a copy of a videotaped interview of one of the victims containing 15 minutes of footage that was never admitted into evidence. In the unadmitted footage, the victim stated: (1) Gudino Rivas put his finger inside her vagina four or five times and made her touch his penis two or three times; (2) he told the victim he watched videos—presumably pornographic videos—involving grandfathers and their grandchildren; and (3) he told the victim he had not had sex in seven years.

Although the jury's receipt of the extrinsic evidence during its deliberations clearly constituted trial error, the error did not prejudice Gudino Rivas. The additional footage was largely cumulative of other properly admitted evidence and most of it was far less inflammatory than the admitted—and highly compelling—evidence of Gudino Rivas' guilt. Because it is not reasonably probable the defense would have obtained a more favorable outcome at trial if the error had not occurred, the judgment is affirmed.

# II

## BACKGROUND

In May 2021, the district attorney for the County of San Bernardino filed an amended information charging Gudino Rivas with two counts of committing a lewd act upon F.D., a child under the age of 14 years (Pen.

2

Code, § 288, subd. (a); counts 1 and 4),[1] three counts of committing a forcible lewd act upon F.D. (*id.*, subd. (b); counts 2, 3, and 5), three counts of committing a lewd act upon A.D., a child of 14 or 15 years, by a person more than 10 years older than the child (*id.*, subd. (c)(1); counts 6, 7, and 8), and one count of committing a lewd act upon S.D., a child under the age of 14 years (*id.*, subd. (a); count 9). For counts 1–5 and 9, the amended information alleged Gudino Rivas committed an offense against more than one victim under the One Strike law. (§ 667.61, subd. (j)(2).) The case proceeded to a jury trial.

A. *Prosecution Case*

Gudino Rivas was born in 1966. During the relevant timeframe, he lived with his longtime partner, Ana Maria, in the city of Colton. She had five grandchildren, including two of the three alleged victims, A.D. and S.D.

1. *Sexual Misconduct Involving F.D. (Counts 1–5)*

In the summer of 2014, 12-year-old F.D. and her family moved into a home a few houses away from Gudino Rivas and Ana Maria. Gudino Rivas coached a soccer team on which F.D.'s cousin played. After F.D.'s family moved in, Gudino Rivas and Ana Maria offered to babysit her and her younger brother while their mother worked. Gudino Rivas or Ana Maria sometimes watched the children alone while the other partner was away. Gudino Rivas committed lewd acts against F.D. several times during the summer of 2014.

On one occasion, Gudino Rivas was watching F.D. and her brother at Gudino Rivas's home while Ana Maria was away. F.D. did not feel well, so Gudino Rivas told her to lie down on the living room couch and rest her head on his lap. F.D. laid down on the edge of the couch, away from Gudino Rivas,

---

[1] Further undesignated statutory references are to the Penal Code.

because she did not feel comfortable resting her head on his lap. However, he moved closer to her and covered her with a blanket. He then forced her onto his lap and touched her thigh, back, shoulders, and breasts over her clothing. She did not recall how long the touching lasted, but "[i]t felt like forever" and she grew uncomfortable.

F.D. stood up and told Gudino Rivas she "did not want to do that." He stood up as well and tried to persuade her to lie back down, but she "scooted away from him." Soon after, F.D.'s mother called on the phone and F.D. went outside to speak with her. F.D. told her mother that Gudino Rivas was "being weird" and "doing weird things." Her mother mistakenly believed she was describing the symptoms of a stroke Gudino Rivas had suffered years earlier, so she told F.D. to behave and said his behavior was merely the result of an accident he had experienced.

After the phone call, F.D. returned inside and stayed in the kitchen because she "did not want to go back" to the couch. However, Gudino Rivas persuaded her to return to the living room and sit back down on the couch. There, he grabbed her hand, pulled it inside his sweatpants, and forced her to feel his penis over his underwear. She tried to pull away, but he held her hand firmly, did not let her withdraw, and moved her hand around against her will. His underwear had a hole in it and he forced her to touch the bare skin of his penis and his testicles through the hole. She told him she did not like touching him and did not want to do it. In response, he kissed her and said he wanted to be a fatherly figure to her and teach her things her own father could not teach her. Eventually, he relented and let go of her because she was trying to tug her hand away from him.

A few weeks later, Gudino Rivas and Ana Maria hosted a house party, which F.D. attended. During the party, Gudino Rivas followed F.D. to the

4

bathroom, grabbed her arm, and pinned her against the wall.  He licked and kissed her mouth, face, and neck, and put his tongue in her mouth.  He also said he wanted to take her into a room to "do things" with her.  F.D. squirmed free and locked herself in the bathroom.  Gudino Rivas rattled the locked door, banged on it, and told her to open it.  When she eventually emerged from the restroom, he was no longer standing there.

A week later, Gudino Rivas went to F.D.'s house where she was babysitting her brother.  Gudino Rivas invited F.D. and her brother to his house.  F.D. did not want to go, but her brother did, so he got dressed and went over to Gudino Rivas's house.  Meanwhile, Gudino Rivas stayed behind and told F.D., "your younger brother is going to be there, so you know what will happen to him if you don't go."  F.D. believed Gudino Rivas would molest her brother, just as he had molested her.  She decided to go over to Gudino Rivas's house because she "would rather him do that to [her] than [her] younger brother."

When F.D. arrived at Gudino Rivas's home, her brother was playing in a bedroom and Gudino Rivas was seated on the living room couch and watching a Telenovela.  Gudino Rivas stood up and closed the bedroom door. He then started playing a pornographic video on the television.  In the video, a naked woman performed oral sex on a naked man.  Gudino Rivas told F.D. he wanted her to perform oral sex on him, like the woman in the video, so she would "know what to do" when she was older.  F.D. felt scared and uncomfortable, opened the bedroom door, grabbed her brother, and left the house with him.

A couple weeks later, Gudino Rivas asked F.D. to help fix a computer at his home.  F.D. agreed to help him because Ana Maria was home and she thought it would be safe to come over.  As F.D. began fixing the computer,

Gudino Rivas came up behind her, touched her upper thighs over her clothing, and kissed her neck. This lasted "a couple of minutes," and it ended when Ana Maria entered the room. F.D. believed Ana Maria witnessed Gudino Rivas's inappropriate behavior. At one point, after Ana Maria left the room, Gudino Rivas told F.D. that Ana Maria did not see anything and she would not tell F.D.'s mother.

Another time, F.D. and Gudino Rivas were seated on the living room couch watching television while Ana Maria was away. The television program depicted a man sitting on a chair and a woman sitting on the man's lap and straddling him face-to-face. Gudino Rivas positioned F.D. on top of him in the same manner. He then moved her up and down on his lap and grabbed her waist, buttocks, and thighs over her clothing. F.D. pulled away when Ana Maria returned home.

Another act of molestation occurred while Gudino Rivas was showing F.D. and her brother the inside of a big rig truck parked in his backyard. Gudino Rivas sat in the driver's seat, placed her brother on his lap, and acted as if her brother was driving the truck. Then, he set F.D.'s brother down and said it was her turn at the wheel. He grabbed her, pulled her onto his lap, and groped her upper thighs, vagina, and buttocks over her clothing.

F.D. and her family moved away a few months after moving in. She disclosed the assaults to a friend, but did not disclose them to her family members for years. She felt "angry," "embarrassed," and "guilty," and worried she would be "judged" if she disclosed the molestation to others.

2. *Sexual Misconduct Involving A.D. (Counts 6–8)*

A.D. is a granddaughter of Ana Maria. She moved in with Gudino Rivas and Ana Maria in May 2019, when she was 15 years old, and she lived with them until October 2019.

6

A.D. was "young" the first time Gudino Rivas made her feel uncomfortable. He touched and rubbed her vagina over her clothing and beneath her underwear. According to A.D., this touching happened "[a] lot of times."

Gudino Rivas also placed A.D. on top of him, pulled down her underwear, and pulled down his own underwear. After he exposed his penis, he moved her back and forth on top of him and she felt his penis on her at least 10 times. These incidents occurred in the bedroom and the living room of Gudino Rivas and Ana Maria's house.

During a recorded interview with law enforcement, A.D. recounted three specific sexual assaults Gudino Rivas perpetrated against her. The footage containing the descriptions of these incidents was admitted at trial.

The first incident took place in September 2019, while Ana Maria was away. One day, A.D. was getting ready for school in her bedroom. Gudino Rivas came up behind her, hugged her, and kissed her neck. She turned around and he tried to convince her to kiss him, but she refused because she thought it was "nasty" to kiss the man she thought of as her grandfather. Eventually, she relented and kissed him, at which point he stuck his tongue in her mouth. He then guided her to the bed, kissed her on the mouth again, tried pulling down her pants, and told her he wanted to "try something new" and "kiss [her] there." A.D. pulled away and Ana Maria returned home shortly after.

The second incident also occurred in September 2019, while Ana Maria was away. A.D. woke up and said good morning to Gudino Rivas, who was seated on a bed. He hugged her and asked her to stay with him. After she got on the bed, he pulled her close, lifted her shirt up, and rubbed her back for two or three minutes. He then rubbed her vagina beneath her underwear

and tried to pull her hand underneath his shorts to touch his penis. She resisted and he returned to rubbing her vagina beneath her underwear. He then pulled down his pants and underwear, pulled down her pants to her knees, and moved her on top of him so her exposed vagina touched his exposed penis.

During the third incident, which took place in October 2019, A.D. went to say goodnight to Gudino Rivas. He was sitting on the living room floor and watching television. As she leaned down to say goodnight and hug him, he pulled her to the ground and cradled her like a baby. He rubbed her belly beneath her clothing for a few minutes, reached under her bra, and touched her breast. She tried to leave, but he asked her to kiss him and sleep with him. She kissed him on the forehead and again tried to leave, but he held her firmly, continued rubbing her belly, and reached beneath her underwear to try to touch her vagina. At that moment, Ana Maria walked in the room and smacked Gudino Rivas with a towel or an article of clothing. A.D. left the room and went to her bedroom, and Ana Maria followed. A.D. disclosed what had happened to her, but Ana Maria said she did not believe her. That night, A.D. called 9-1-1 and reported the abuse to law enforcement.

3. *Sexual Misconduct Involving S.D. (Count 9)*

S.D. is a granddaughter of Ana Maria and the younger sister of A.D. She moved in with Gudino Rivas and Ana Maria in 2018, when she was 13 years old.

Gudino Rivas engaged in many behaviors that caused S.D. to feel uncomfortable. Several times, he grabbed her, pulled her in close, and kissed her on the lips. He also smacked her on the buttocks over her clothing as she walked by him. She occasionally slept with Gudino Rivas and Ana Maria in

the same bed and, when she did, Gudino Rivas would pull S.D. close to him so that they touched.

Once or twice, Gudino Rivas came into the bedroom where S.D. was texting or playing and climbed on top of her. He tried kissing her and told her he wanted her. S.D. felt uncomfortable and told him to get off her.

Twice, Gudino Rivas gave S.D. leg massages because she was experiencing aches and pains in her ankle and knee. He massaged her thigh and worked his way up to her vagina. He touched the side of her vagina, beneath her underwear, but did not insert himself inside her vagina. S.D. told Ana Maria about the molestation, but Ana Maria brushed aside her granddaughter's concerns.

### 4. *Uncharged Sexual Misconduct*

M.D. is another granddaughter of Ana Maria and the younger sister of A.D. and S.D. She lived with Gudino Rivas and Ana Maria when she was six or seven years old. M.D. occasionally slept in the same bed with Gudino Rivas and Ana Maria. One night, he rubbed her "lower private part" over her clothing for a few minutes.

J.D. met Gudino Rivas when she was 11 or 12 years old. Her father played soccer on a team coached by Gudino Rivas. J.D. regularly attended team barbeques at Gudino Rivas and Ana Maria's home. Every time she came over, he kissed her on the lips for about 10 seconds. He sometimes touched and patted her thighs over her clothing too. J.D. witnessed Gudino Rivas kissing F.D. on the lips and F.D. saw him kissing J.D. on the lips about 10 times. F.D. also saw him kiss J.D.'s 15-year-old and 16-year-old sisters on the lips two or three times.

B. *Defense Case*

The defense called three witnesses to testify—Gudino Rivas, Ana Maria, and their son.

According to Gudino Rivas, F.D. came over to the family home "two or three times," but only while Ana Maria and F.D.'s brother were present. He denied touching F.D. in a sexual manner or watching sexually explicit videos with her. He recalled J.D. coming to the house with her parents, but denied touching her in a sexual manner or watching television with her alone. Gudino Rivas also denied engaging in inappropriate behavior with any of Ana Maria's grandchildren. With regard to the incident on October 5, 2019, he claimed A.D. was angry and upset that day because Ana Maria would not allow A.D. to attend a party unless she brought her siblings along. According to Gudino Rivas, A.D. came over to say goodnight, but then tried to grab his penis and insulted him by saying he could not get an erection anymore.

Ana Maria did not see Gudino Rivas engage in inappropriate behavior with F.D. and claimed she never babysat F.D. at her home. She remembered J.D. and her parents coming to the home "a few times" for barbeques, but she never saw J.D. in the home alone with Gudino Rivas. She also did not see Gudino Rivas engage in improper behavior with A.D. and she denied that A.D. reported such behavior to her prior to October 5, 2019. Ana Maria did not believe A.D.'s molestation allegations and thought A.D. was "untrustful."

Gudino Rivas and Ana Maria's son lived with them prior to 2019, but moved out when A.D. moved in. He denied that his parents babysat F.D. and said he never saw her inside the family home. He acknowledged J.D. came to the home for parties, but he never saw her with Gudino Rivas alone. He denied seeing Gudino Rivas engage in any improper behavior with F.D., A.D., S.D., M.D., or J.D.

10

C. *Verdict and Post-Verdict Revelations*

The jury found Gudino Rivas guilty of counts 1 through 8. By a vote of 11-1 (in favor of guilty), the jury deadlocked on count 9. Therefore, the court declared a mistrial for count 9 and dismissed the charge.[2]

After the jury returned its verdicts, trial counsel for both parties spoke informally with the jurors about the jury deliberations. During these discussions, counsel learned the jury had inadvertently received extrinsic evidence that was not admitted at trial. In particular, the court played a 66-minute video recording of A.D.'s interview with law enforcement during trial and admitted into evidence the corresponding 39-page written transcript of the recorded interview. However, during deliberations, the court or its staff mistakenly supplied the jury with an extended video recording of the interview. The recording included 15 additional minutes of footage that was not admitted into evidence, which corresponded to an additional nine and a half pages on the written transcript.

Gudino Rivas moved for a new trial under section 1181, subdivision (2), on the ground the jury had received extrinsic evidence that was not admitted at trial. The district attorney opposed the motion for a new trial, principally on the basis that the jury's receipt of the unadmitted portion of the video recording did not prejudice Gudino Rivas. The court denied the motion for a new trial, reasoning that any error in the jury's receipt of unadmitted evidence was harmless.

Thereafter, the court sentenced Gudino Rivas to an aggregate term of 42 years in prison, consisting of ten years (the upper term) for each of counts 2, 3, and 5, eight years (the upper term) for count 1, two years for

[2] Because the court dismissed count 9, the multiple-victim allegations for counts 1 through 5 could not be sustained as a matter of law.

11

count 4 (one third the middle term), and eight months (one third the middle term) for each of counts 6, 7, and 8.

## III

## DISCUSSION

A jury's exposure to extrinsic evidence that it receives from the court or court staff constitutes an ordinary trial error. (*People v. Gamache* (2010) 48 Cal.4th 347, 396–399 (*Gamache*); *People v. Clair* (1992) 2 Cal.4th 629, 667–668 (*Clair*); *People v. Cooper* (1991) 53 Cal.3d 771, 836 (*Cooper*).) Here, there is no dispute between the parties that ordinary trial error occurred because the court or its staff inadvertently supplied the jury an extended version of the recording of the law enforcement interview with A.D., which included portions of the interview that were not admitted into evidence.

Because the parties agree there was ordinary trial error, the sole issue presented in this appeal is whether the jury's receipt of the unadmitted portions of the interview was prejudicial. In cases involving ordinary trial error, we apply the prejudice standard derived from *People v. Watson* (1956) 46 Cal.2d 818, 836. (*Clair, supra*, 2 Cal.4th at p. 668; *Cooper, supra*, 53 Cal.3d at p. 836.) "Under that standard, we will reverse the judgment only if, after an examination of the entire cause, it is reasonably probable that defendant would have obtained a more favorable result in the absence of the error. [Citation.] Defendant has the burden of demonstrating prejudice under this standard." (*People v. Triplett* (2020) 48 Cal.App.5th 655, 663.)

Gudino Rivas identifies three potentially prejudicial topics A.D. discussed with the interviewing law enforcement officer in the unadmitted segment of the video recording that was improperly provided to the jury.

First, A.D. informed the officer that Gudino Rivas inserted his fingers inside her vagina a total of four or five times and forced her to touch his penis

on two or three occasions. However, this information was largely cumulative of other properly admitted evidence detailing Gudino Rivas's abusive actions. (See *Gamache, supra*, 48 Cal.4th at pp. 398–403 [jury's consideration of unadmitted recorded interrogation of defendant was harmless because defendant's statements on recording were largely "cumulative" of "similar" evidence that was admitted in penalty phase of trial].)

For example, on direct examination, A.D. testified that Gudino Rivas felt and played with her vagina beneath her underwear more than once. She stated he touched her vagina "a lot of times," and she felt his penis "various" times. She also testified he placed her on top of him and moved her body back and forth "various times" to rub his exposed penis against her exposed vagina. Similarly, during the admitted portions of the recorded interview, A.D. said Gudino Rivas "touched [her] in a sexual way," and then provided detailed accounts of three incidents of sexual assault perpetrated against her by Gudino Rivas. Although Gudino Rivas claims he was prejudiced by the jury learning from the extrinsic evidence that he actually inserted his fingers into A.D.'s vagina, this information was not qualitatively different in nature from the evidence the jury had already received about Gudino Rivas's repeated acts of sexual abuse and the fact that he touched and played with A.D.'s genitals on numerous occasions. It is not reasonably probable Gudino Rivas would have obtained a more favorable outcome but-for the jury's consideration of A.D.'s statement about the number of times she touched his penis and the number of times he inserted his fingers inside her vagina.

Second, A.D. stated that Gudino Rivas told her he watches videos— presumably pornographic videos—depicting grandfathers and their grandchildren. "This statement was not cumulative, but neither was it prejudicial." (*Gamache, supra*, 48 Cal.4th at p. 402.) At trial, there was

13

copious evidence that Gudino Rivas not only harbored an unnatural sexual attraction towards minor children, including young family members, but that he acted upon his deviant desires whenever an opportunity presented itself. In total, five witnesses—all members of Gudino Rivas's family and tight-knit neighborhood—came forward to testify that he abused and molested them when they were children. The testimony revealed that this abuse extended over several years and involved multiple young victims, who testified at trial that the abuse left them feeling ashamed, embarrassed, and confused. Given this forceful and convincing evidence, it is not reasonably probable the jury's receipt of A.D.'s statement about Gudino Rivas's pornography viewing habits altered the outcome of trial.

Third, in the course of disclosing to the law enforcement officer the September 2019 incident in which Gudino Rivas pulled A.D. on top of him so that her exposed vagina touched his exposed penis, A.D. said she told Gudino Rivas, "I don't like this. This isn't right." She told the officer that Gudino Rivas replied, "I know that but I haven't had anything in 7 years and I try with your grandmother but she doesn't let me." This evidence is similar to other properly admitted evidence establishing that Gudino Rivas employed various manipulation tactics to lure his young victims into submission.

For example, in the admitted portion of the videotaped interview with A.D., she indicated that Gudino Rivas tried to normalize his improper conduct by telling her, "[I]t's just a kiss … a kiss don't mean nothing … just give me a kiss." At trial, F.D. testified that Gudino Rivas cajoled her into touching his penis by telling her "he wanted to be a father figure and … teach [her] things that [her] father could not teach [her]." According to F.D., he also told her he wanted her to orally copulate him "so that when [she got] older, [she would] know what to do." F.D. further testified that, on at least

14

one occasion, he gave her a menacing reminder that her younger brother was at his home and she knew "what [would] happen to him" if she did not come over and submit to his unwanted advances. Given the copious evidence that Gudino Rivas employed emotional manipulation tactics in furtherance of his abusive behavior, the jury's receipt of unadmitted interview footage describing one additional type of manipulation tactic was harmless.

The trial court erred when it, or its staff, provided the jury with 15 minutes of videotape footage that was not admitted into evidence. However, the footage was largely cumulative of the properly admitted evidence, which told a compelling story of sexual abuse perpetrated by Gudino Rivas against several young victims over many years. Because it is not reasonably probable the outcome of trial may have been different but-for the jury's exposure to the additional footage, the error was harmless.

IV

DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

O'ROURKE, J.

CASTILLO, J.

15